## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        **Plaintiff,**<br><br>**v.**<br><br>GEORGE IAKOVOU,<br>VIKA VENTURES LLC,<br>PENELOPE ZBRAVOS,<br><br>        **Defendants.** | Civil No. |

## COMPLAINT

Plaintiff, United States Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

## INTRODUCTION

1.      Beginning in late 2019 through the end of 2021, George Iakovou ("Iakovou") the co-founder and Chief Executive Officer ("CEO") of Vika Ventures LLC ("Vika"), used Vika to defraud investors of more than $6.09 million through fraudulent offers and sales of purported shares of private companies that might hold an initial public offering ("IPO").  Iakovou enticed investors to Vika by offering for sale hard to acquire securities in desirable pre-IPO companies at lower prices than other venture capital firms.  However, at both the time of the solicitation and the execution of contracts for sale, Vika did not own the shares and, subsequently never acquired them.  Instead of purchasing securities, Iakovou used investor funds to support his lavish lifestyle.

2.     Iakovou created documents that he provided to potential and actual investors that he knew, or was reckless in not knowing, contained materially false and misleading information about Vika's business model and investment opportunities.  Iakovou told investors via email, by telephone, and through text messaging that he, through Vika, would invest their money in pre-IPO securities of particular companies.  After entering into contracts for sale, investors wired money or wrote checks to Vika believing they had purchased specific amounts of pre-IPO securities.  However, Iakovou knew Vika did not own the shares he offered for sale at the time of the solicitation, and Vika, through Iakovou, subsequently never acquired them.

3.     From late 2019 through June 2021, Penelope Zbravos ("Zbravos"), Vika's other co-founder and then-girlfriend of Iakovou, performed important tasks with respect to the company including opening business bank accounts, completing paperwork necessary to form the business, and other administrative tasks.  Zbravos was not initially aware of the fraud. However, after multiple red flags, by December 2020 Zbravos should have known Vika was a fraudulent scheme.  Nevertheless, she continued to perform tasks at Vika that perpetuated the scheme including effecting large wire transfers of investor proceeds.

4.     Throughout the fraud, Iakovou provided potential and actual investors with formal documentation that Iakovou knew contained materially false or misleading information, including private placement memorandums ("PPMs"), welcome letters, and Vika company profiles that appeared online.  This documentation informed investors of Vika's supposed process to acquire pre-IPO securities, provided investment information, and background of supposed previous deals made by Vika, including a report that depicted Vika as having $80 million assets under management with ten investments supported by nine employees.  None of this information was accurate.

5.      The Vika website, controlled by Iakovou, contained materially false and misleading information that led potential and actual investors to believe that Vika had previously participated in major IPOs when, in fact, it had not.  The Vika website also touted participation in funding rounds for high-profile private companies.  Vika never participated in any funding rounds and never acquired interest in any such securities.

6.      Iakovou enticed investors with fictitious pricing information for the various pre-IPO securities Vika was purportedly offering.  He told investors they could purchase the various pre-IPO securities at very attractive prices because Vika had such strong connections in the industry, made sizable deals previously entitling the company to better pricing for future deals, and because Vika was a young company, it would offer securities at cost.  As Iakovou and Vika never closed a single deal to purchase securities, Iakovou fabricated all the pricing information to convince investors to purchase securities through Vika.

7.      When investors' funds came into Vika, Iakovou and Zbravos effectively split the funds three ways amongst themselves and the company, although the vast majority of funds retained by Vika were ultimately routed to Iakovou.

8.      Vika never purchased or owned any securities and investors received neither securities nor payments.  Instead, Iakovou spent the approximately $3.9 million of proceeds he received on his lavish lifestyle including renting private jets, purchasing expensive watches, jewelry, and cars, and partying at nightclubs in Miami, New York, France, and Greece.

9.      In total, from 2020 to 2021, Iakovou and Vika raised more than $6.09 million from at least 46 investors, through their fraudulent offers and sales of purported pre-IPO securities, by means of false and misleading misrepresentations and omissions of material fact, as well as deceptive acts and a course of conduct designed to defraud investors.  Zbravos, for her

3

participation in the scheme, received more than $2.1 million, some of which she also spent on luxury goods, cosmetic surgery, vacations, and commissioning a fountain in Greece.  To date, investors have not received any securities, payouts, or return of funds.

10.    As a result of the conduct alleged in this Complaint, Iakovou and Vika violated the anti-fraud provisions of the federal securities laws, specifically, the Securities Act of 1933 ("Securities Act") Section 17(a) [15 U.S.C § 77q(a)], the Securities Exchange Act of 1934 ("Exchange Act") Section 10(b) [15 U.S.C § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5], and Zbravos violated Securities Act Section 17(a) [15 U.S.C § 77q(a)].

11.    The Commission requests that the Court enjoin Defendants from further violations of the federal securities laws as alleged in this Complaint, and order them to pay a monetary penalty based upon these violations.  The Commission also requests that the Court order Iakovou and Zbravos to pay disgorgement amounts, and prejudgment interest thereon, based upon these violations.  The Commission finally requests a judgment against Iakovou barring him from serving as an officer or director of a public company and enjoining him from participating in the issuance, purchase, offer, or sale of any security as specified below.

## THE DEFENDANTS

12.    **George Iakovou ("Iakovou")**, 29, is a resident of New York, NY.  He is a co-founder of Vika and represented himself to investors as its CEO.  Iakovou invoked his Fifth Amendment right against self-incrimination when subpoenaed for documents and testimony by the Commission.

13.    **Vika Ventures LLC ("Vika")** is a Delaware limited liability company formed by Iakovou and Zbravos on November 7, 2019 with its principal place of business in New York, NY.  Vika has never registered an offering of securities with the Commission, and its securities

do not trade on any exchange.  It has never been registered with the Commission as a broker, dealer, or investment adviser.

14.     **Penelope Zbravos ("Zbravos")**, 27, is a resident of Queens, NY. She is a co-founder of Vika.  Prior to working at Vika, she was a financial analyst at a hospital network in New York and prior to Vika, and she had extremely limited experience with the venture capital industry.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

16.     This Court has personal jurisdiction over Iakovou, Vika, and Zbravos (collectively the "Defendants"), and venue is proper in this District because the Defendants engaged in certain acts and transactions constituting violations of the Securities Act and the Exchange Act, such as investor solicitations, fraudulent offerings, and communications with investors in this District.

17.     In connection with the conduct alleged in this Complaint, specifically the solicitation, offer, and sale of pre-IPO securities, the making and dissemination of fraudulent statements, and the undertaking of fraudulent acts and practices, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, such as through email, the telephone, and text messages.

## DEFENDANTS' ACTS IN VIOLATION OF THE FEDERAL SECURITIES LAWS

### A.    The Creation of Vika Ventures

18.     Iakovou has worked in the financial services sector since 2015 and has unsuccessfully attempted to pass the entry-level registered representatives' exam on no less than three occasions.  Since 2018, Iakovou was employed at an exempt reporting private fund advisor that primarily conducted deals in the pre-IPO space.  During the summer of 2019, Iakovou asked his then-girlfriend, Zbravos, to work as his assistant there.  However, after a series of disagreements with the owner of the private fund advisor, including about Iakovou's failure to pay back monies owed to him, in November 2019, Iakovou left the advisor to strike out on his own.  Zbravos left with Iakovou.

19.     In fall of 2019, Iakovou and Zbravos founded Vika as a start-up venture capital fund offering for sale pre-IPO securities of well-known private companies.  Iakovou held himself out as the CEO, served as the face of the company, and communicated with potential and actual investors.  Zbravos was Vika's Finance Manager and performed various duties, primarily back office support.

20.     Zbravos assisted Iakovou with the formalities necessary to start the business including registering the company with the proper authorities, designing the logo and creating the Vika website.  Zbravos also created pitch decks shown to potential investors by Iakovou that described Vika as well as the individual investment opportunities.  She created and maintained a spreadsheet of investors and their investments.

21.     To attract investors, Iakovou created a series of documents that conveyed materially false and misleading information about Vika but appeared genuine to investors. Specifically, Iakovou enrolled Vika in an online investing profiling platform that allowed him to

self-report information and create a Venture Capital Profile ("Vika Profile") to share with potential investors. Iakovou falsified information about Vika's net worth, previous investments, assets under management, and number of employees and falsely reported that by December 2020 Vika had more than $80 million assets under management with ten investments supported by nine employees, none of which was accurate. Iakovou sent investors the Vika Profile along with reports from this online platform for various private companies Vika was offering of pre-IPO securities. Investors believed this information accurately reflected Vika as a growing and dynamic business while Iakovou knew the documents were entirely fabricated.

22.     Iakovou also provided potential investors with PPMs for Vika that he created and that contained materially false or misleading information. For example, Iakovou provided a PPM to potential investors that represented that Vika would acquire shares or interests in pre-IPO companies on behalf of investors. The PPMs portrayed Vika as a legitimate business, however, no securities were ever purchased by Vika.

23.     Vika's website touted purported previous investments made by Vika in companies that had successful IPOs as well as opportunities to invest in much sought after private companies anticipating IPOs. Through its website, Vika held itself out as a venture capital firm with prior successes. In actuality, this information was materially false and misleading as Vika had not participated in any previous investments nor did it own any shares in pre-IPO companies.

24.     Prior to investing with Vika, several investors visited Vika's website and were presented with the false and misleading information. They also viewed hyperlinks to several news articles that quote Iakovou in various financial news publications talking about similar investment opportunities, all of which created the aura of a highly successful company, leading individuals to invest.

### B.    Vika's Fraudulent Offer and Sale of Pre-IPO Securities

25.    Vika received its first investment on January 2, 2020 when the mother of Iakovou's childhood friend invested $105,000 for what she believed was an investment in the pre-IPO shares of Company A.  Ultimately, Iakovou and Zbravos transferred or received over half of these funds to their personal bank accounts.  From the remaining monies, Zbravos made payments to the Vika business credit card for personal expenses incurred by Iakovou.  No shares were ever purchased in Company A for the benefit of Vika's first investor.

*Georgia Investing Group*

26.    Vika did not receive another investment for nearly six months until Iakovou connected with a former client from his previous employer.  In June 2020, Iakovou pitched Vika to this individual who lives in Georgia and is a member of an informal, social investing club that shares interesting investment opportunities with its participants.  This individual and a few other club participants happened to be pricing the pre-IPO securities of Company B around the time Iakovou reached out.  When asked about Company B, Iakovou told this individual that Vika could offer it at $200 a share.  Because the other two identified offers came in at $250 and $275 per share and one investor had a prior positive experience with Iakovou, these three individuals each decided to invest with Vika after reviewing the supporting paperwork provided by Iakovou.

27.    When one investor from Georgia asked about the fee structure for the initial Company B offer, Iakovou confirmed the investor's understanding that he could pay an extra $1,000 "commission" rather than have Iakovou take the fee out of his investment.  Iakovou told the investor: "[t]hat way the full $20,000 would be towards stock."  However, Iakovou and Vika never purchased any shares of Company B on his behalf.

28.     Several of the Georgia investors shared information about their Vika investments with numerous friends and family, who in turn, shared with other friends and family.  By offering all of these individuals incredibly enticing deals in additional companies, Vika received investments from 34 people in approximately eight private companies.

29.     For example, on March 2, 2021, Iakovou emailed various investors with an alleged opportunity in Company C.  Iakovou said via email:  "Just sending out [the Company C] docs again.  We have a hard deadline of Wednesday for money in to close the transaction before IPO.  Price is set at $6.50.  Your fee structure will be 0% upfront and 10% on the back."  Following Iakovou's solicitation, at least six individuals with prior Vika investments made what they thought were investments in Company C.

30.     From June 2020 until early April 2021, Iakovou and Vika defrauded these 34 individuals of approximately $2.9 million by leading them to believe they were investing in pre-IPO companies when, in fact, no shares were purchased.

*Other Vika Investors*

31.      On June 23, 2020, a Zbravos family member wired $50,000 to Vika for what she believed was an investment in Company A.  On July 3, 2020, Iakovou sent the family member and Zbravos the buy confirmation letter for the purchase.  The letter sent via email stated:

> Your total capital contribution of $50,000.00 received on June 23rd, 2020, constitutes a 100% membership interest in Series A-9 of the company.  Series A-9 currently holds 9,090 shares of common stock for [Company A] through an affiliate of the Company.  There have been 0% fees deducted on this transaction and your capital contribution is $50,000.00 which has been applied to an investment in 9,090 underlying shares of Company A at a purchase price equivalent to $5.50 per share.

Vika did not hold 9,090 shares of common stock for the family member.  Upon receipt of the proceeds, Iakovou directed Zbravos to wire $5,000 to each of their personal accounts.  The

remaining $40,000 was ultimately used by Iakovou for his lavish personal spending.  No shares were purchased on the family member's behalf.

32.     In January 2021, a group of investors from California and Indiana who pool resources to make investments in pre-IPO securities came across the Vika website and other internet information regarding Vika while researching potential opportunities to invest in Company B and contacted Iakovou.  Iakovou told them Vika was authorized by Company B to transact secondary stock sales from employees and investors.  Iakovou also provided them with the Vika Profile, a company profile from the online investing platform for Company B, Vika's PPM, and a redacted stock transfer agreement that purported to show Vika holding Company B securities.  Given these assurances, on January 27, 2021, these investors wired $2.06 million to Vika for what they believed was for 8,000 shares of Company B at $250 a share with an upfront fee of 3%.  Iakovou directed Zbravos to wire him $690,000 and transfer $690,000 to herself on January 28, 2021.

33.     On February 8, 2021, the group made an additional investment for 1,600 shares of Company B and wired $412,000 to Vika.  On February 9, 2021, at Iakovou's direction, Zbravos transferred $150,000 of this money to her personal bank account and wired $150,000 to Iakovou's personal account.  No Company B shares were ever purchased.

34.     After these initial investments, these investors expressed interest in another deal with Vika but wanted additional assurances from Iakovou before proceeding.  Iakovou made two trips to California to meet with them.  During those trips, he made various promises, including that he would file a Form ADV with the Commission, create an online portal to track their investments, provide proof of actual ownership of the securities, and provide a notarized and unredacted stock transfer agreement.  Although Iakovou had dinner with the investors one night,

he then postponed meeting with them thereafter.  Iakovou claimed he was sick.  The investors

only learned by calling his hotel that Iakovou had already traveled back to New York.  Iakovou

never provided the requested information, and the group did not invest again thereafter.

35.     In June 2021, after Iakovou ceased communicating with them, these four

investors made contact with both Company B and another company for which Vika had solicited

an investment.  Both companies told these investors they had no relationship with Vika nor was

Vika authorized to transact on their behalf.

<em>Iakovou's Additional Lies</em>

36.     In March 2020, a credit card company closed the Vika charge account after

Iakovou made several unsuccessful payments after charging tens of thousands of dollars in

personal expenses.  Zbravos used her own funds to pay the balance and sought reimbursement

from Iakovou.  Iakovou paid Zbravos back with proceeds received from investors.  In fact,

Iakovou repaid a portion of the balance by instructing Zbravos to take the proceeds of an entire

investment sent by one individual.  When asked how Vika would give this person his Company

A shares, Iakovou told Zbravos he had "extra" shares, which was patently false.

37.     To further hide his misconduct, Iakovou took steps to direct the use of fictitious

wire transfers.  In November 2020, five months after Vika began raising money in earnest,

Iakovou attempted to make a wire transfer to an entity he told Zbravos was the investment bank

from which Vika was purchasing the pre-IPO securities.  Since he was not able to make the

transfer, Iakovou instructed Zbravos to send money via an ACH payment system for the

purchase of pre-IPO securities.

38.     Despite the volume of investor proceeds coming into Vika for investments, this is

the first time Iakovou instructed Zbravos to wire funds for the purchase of securities.  During her

11

employment with Vika, Zbravos wired more than $1 million to this account without ever receiving a single confirmation of monies received or stock purchased.  Unbeknownst to Zbravos, the purported investment bank account number Iakovou provided to her belonged to one of his friends who ultimately transferred almost all of the funds back to Iakovou.

39.     In January 2021, Zbravos texted Iakovou to say that their friends thought Vika, Iakovou, and Zbravos were "scammers & unprofessional" stating, "You've been lying to me. . . .If you didn't have the f*!@(* stock why did you do this?"  Iakovou did not reply.

*The Unraveling of Vika*

40.     Some investors believed they owned shares of Company A which conducted its IPO in September 2020.  Iakovou told the investors who believed they owned pre-IPO securities in Company A – including Zbravos' family member – that there was a six month lock up period which would expire at the end of March 2021.  At March's end, investors began questioning Iakovou as to when they would receive their shares.

41.     Iakovou provided a myriad of false or misleading excuses as to why Vika could not transfer the shares.  First, Iakovou said there was a long list of investing firms that the transfer agent was working through and Vika's shares were not priorities.  Then, he said the transfer agent experienced significant issues and would not be able to send the shares promptly. Iakovou sent multiple emails blaming various delays, however, the truth was that Vika never purchased the securities.  Thereafter, he ceased communicating with any investors.

42.     Around the time Vika investors were inquiring about Company A shares, Zbravos ended her romantic relationship with Iakovou after she uncovered several lies – both personal and professional – that he told her.  She formally left the company on June 4, 2021.

43.     After Zbravos' departure, Iakovou continued to raise approximately $395,000 funds from additional investors through at least December 2021.  Iakovou directed these investors write checks or wire funds to his personal account earmarked for a Vika investment, as the existing Vika bank accounts had been closed.

C.     **Zbravos Ignored Red Flags**

44.     While Iakovou pitched purported investment opportunities to various individuals, Zbravos supported the company behind the scenes.  She edited documents such as the PPMs and the welcome letters, drafted pitch decks for Iakovou to use with potential and actual investors, and maintained the spreadsheet of the investor funds that Vika received.  Given Iakovou's negative financial history of delinquent payments, Zbravos opened bank accounts for Vika and a business credit card for Vika using her financial history.  Zbravos had prime responsibility for the Vika bank accounts and effected the vast majority of payments and wire transfers.

45.      In October and November 2020, Zbravos began asking Iakovou questions regarding the wire transfers to the investment bank and about his actions and personal spending. By December 2020, Zbravos knew or should have known that Iakovou and Vika were conducting a fraudulent scheme.  Zbravos ignored these red flags and continued to transfer large amounts of investor proceeds into her and Iakovou's personal bank accounts for several more months even in the face of additional warning signs.

46.     For example, on April 3, 2021, Zbravos discovered that Iakovou had faked the emails supposedly sent to her from the investment bank.  Zbravos texted Iakovou, stating, "I think if you want to save yourself. Stop taking accepting further investments & find whatever stock you don't own & end it."

47.     Iakovou responded that he had all the stock that was needed, to which Zbravos replied: "No you don't, can you stop lying to me for just a second & talk openly. Forget about [stock transfer agreements] you don't even have confirmation emails stating the purchase of stock."  Despite these conversations, Zbravos continued to manage the funds in the bank accounts from new investors well into the end of May 2021, wiring herself and Iakovou shares of the proceeds.

48.     Zbravos formally removed herself from all Vika entities' operating agreements on June 4, 2021.  As she was in the process of leaving Vika, Zbravos transferred $300,000 from Vika's account to her personal account in order to negotiate a buyout from Iakovou, telling him she thought it was 'insulting' that she would give up her 50 percent ownership stake in Vika for nothing.

49.      Iakovou replied "[it is] insulting that you barely did anything and made $2.5M and now you're holding my stock money hostage."  Ultimately, she and Iakovou agreed she would keep $60,000 as her payout.  Between June 4, 2021 and June 10, 2021, the Vika bank accounts were emptied of all remaining investor funds and Zbravos closed the accounts.

**D.     Iakovou and Zbravos Syphoned Off Investor Funds for Personal Use**

50.     Iakovou spent his share of the proceeds lavishly.  He spent more than $680,000 on luxury watches and designer jewelry.  Over $173,000 was spent in nightclubs and lounges in Miami, New York, France, and Greece.  Iakovou purchased more than $372,000 worth of designer goods and spent nearly $220,000 renting or buying luxury cars.  Iakovou dined at high-end restaurants with some meals costing more than $112,000.  He spent $56,000 on entertainment and sports betting while also racking up $70,000 on home furnishings.  Iakovou spent nearly $650,000 on private jet travel and another $125,000 on additional travel expenses

including stays at five-star hotels in Miami, Florida, Cannes, France, and Athens, Greece. Iakovou also invested more than $135,000 on a cryptocurrency exchange for his own investment.

51.     Zbravos used investor funds she received to take a luxury vacation in Cabo San Lucas, Mexico, buy designer handbags, enroll in expensive fitness classes, undergo cosmetic surgery, and commission a fountain in her family's village in Greece.  She also benefited significantly from Iakovou buying her expensive jewelry and dining at high-end restaurants. Zbravos deposited $934,000 of investor funds in her personal bank and brokerage accounts.

## FIRST CLAIM FOR RELIEF
### (As to Iakovou and Vika)

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Thereunder
### [15 U.S.C. § 78q(b), 17 C.F.R. § 240.10b-5]

52.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

53.     By engaging in the acts and conduct alleged above, Iakovou and Vika, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchases and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

54.     Through fraudulent solicitations and statements, Iakovou and Vika entered into contracts for sale and obtained money from investors who believed they were purchasing pre-IPO securities from Vika.  By the reasons of the foregoing, Defendants Iakovou and Vika violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
### (As to Iakovou and Vika)

### Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

55.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

56.     By engaging in the acts and conduct alleged above, Iakovou and Vika directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly employed devices, schemes, or artifices to defraud; (2) with negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) with negligence, engage in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)].

57.     Through fraudulent solicitations and statements, Defendants Iakovou and Vika sold securities and obtained money from investors who believed they were purchasing pre-IPO securities from Vika.  By the reasons of the foregoing, Defendants Iakovou and Vika violated,

and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
### (As to Zbravos)

### Section 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(3)]

58.     The Commission realleges and incorporates by reference paragraphs 1 through 51.

59.     By engaging in the acts and conduct alleged above, Zbravos directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with negligence, engaged in transactions, practices or courses of business, which operated or would operate as a fraud or deceit upon the purchasers, in violation of Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

60.      For the foregoing reasons, Defendant Zbravos violated, and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a judgment:

### I.

Permanently restraining and enjoining Defendants Iakovou and Vika from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5;

**II.**

Permanently restraining and enjoining Defendant Zbravos from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**III.**

Permanently enjoining Defendant Iakovou from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of securities in an offering not registered with the Commission, provided, however, that such injunction shall not prevent them from purchasing or selling securities for his own personal accounts;

**IV.**

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

**V.**

Ordering Defendants Iakovou and Zbravos to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon;

**VI.**

Barring Iakovou from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**VII.**

Granting such other and further relief as this Court may deem just, equitable, or necessary.

## <u>JURY DEMAND</u>

Plaintiff respectfully demands a trial by jury.

Dated: December 7, 2022                    Respectfully submitted,


/s/ James M. Carlson
James M. Carlson
Supervisory Trial Counsel
S.D. Fla. Court No. A5501534
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-3711
CarlsonJa@sec.gov

*Counsel for Plaintiff Securities and*
*Exchange Commission*

Of Counsel:
    Michelle I. Bougdanos
    Florida Bar # 20731

    Allison M. Rochford
    Ohio Bar # 96343

*Counsel for Plaintiff*
*Securities and Exchange Commission*