# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　**Plaintiff,**<br><br>　　v.<br><br>**GEORGE IAKOVOU,**<br>**VIKA VENTURES LLC,**<br>**PENELOPE ZBRAVOS,**<br><br>　　　　**Defendants.** | **Case No. 4:22-cv-194** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENTS AGAINST DEFENDANTS GEORGE IAKVOU AND VIKA VENTURES LLC

Dated: April 7, 2023

> James M. Carlson
> Alison Rochford
> Supervisory Trial Counsel
> S.D. Fla. Court No. A5501534
> 100 F Street, N.E.
> Washington, D.C. 20549
> (202) 551-3711
> CarlsonJa@sec.gov
>
> *Counsel for Plaintiff Securities and Exchange Commission*

TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

PROCEDURAL HISTORY ....................................................................................... 2

ARGUMENT ........................................................................................................... 2

    I.      Legal Standards ........................................................................................ 2

    II.     The Factual Allegations of the Complaint Are Deemed Admitted Against Iakovou and Vika ................................................................................................. 3

         A.      The Creation of Vika Ventures ................................................. 3

         B.      Vika's Fraudulent Offer and Sale of Pre-IPO Securities ........................... 5

              1.      Georgia Investing Group ............................................. 5

              2.      Other Vika Investors ................................................... 6

               3.      Iakovou's Additional Lies ............................................ 8

              4.      The Unraveling of Vika ............................................... 10

              5.      Iakovou Misappropriated Investor Funds for His Personal Use .. 10

    III.    Defendants Violated the Anti-Fraud Provisions of the Federal Securities Laws . 11

         A.      Iakovou and Vika Made Material Misrepresentations ............................. 12

          B.      Iakovou and Vika Orchestrated a Fraudulent Scheme ............................. 14

          C.      Iakovou and Vika Acted with Scienter ..................................... 14

          D.      Iakovou and Vika's Actions Utilized Interstate Commerce and Were in Connection with the Purchase of Stocks ............................................. 15

    IV.    The Court Should Grant the Requested Relief Sought By the Commission ........ 16

         A.      Permanent Injunctive Relief as to Iakovou and Vika ............................. 16

          B.      Officer and Director Bar as to Iakovou ..................................... 17

          C.      Conduct Based Injunction as to Iakovou ................................... 17

          D.      The Court Should Defer Ruling on Disgorgement, Prejudgment Interest, and Civil Penalties Amounts Until the Resolution of the Parallel Criminal Case .................................. 18

CONCLUSION ....................................................................................................... 19

### TABLE OF AUTHORITIES

#### Cases

*Aaron v. SEC*,
   446 U.S. 680 (1980) ................................................................................. 11, 12

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988) ....................................................................................... 11

*Buchanan v. Bowman*,
   820 F.2d 359 (11th Cir. 1987) ........................................................................ 2

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ....................................................................................... 14

*Giovanno v. Fabec*,
   804 F.3d 1361 (11th Cir. 2015) ....................................................................... 3

*Nishimatsu Construction Co. v. Houston Nat'l Bank*,
   515 F.2d 1200 (5th Cir. 1975) ......................................................................... 2

*SEC v. Aequitas Mgmt., LLC*,
   2016 U.S. Dist. LEXIS 34187 (D. Or. Mar. 15, 2016) .................................. 18

*SEC v. Bankosky*,
   716 F.3d 45 (2d Cir. 2013) ............................................................................. 17

*SEC v. Carriba Air, Inc.*,
   681 F.2d 1318 (11th Cir. 1982) ................................................................ 13, 14

*SEC v. Eadgear, Inc.*,
   2015 WL 11578507 (N.D. Cal. July 14, 2015) .............................................. 18

*SEC v. Ginsburg*,
   362 F.3d 1292 (11th Cir. 2004) ..................................................................... 16

*SEC v. Levine*,
   517 F. Supp. 2d 121 (D.D.C. 2007) ............................................................... 17

*SEC v. Mattera*,
   2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ................................................. 18

*SEC v. Miller*,
   744 F. Supp. 2d 1325 (N.D. Ga. 2010) .......................................................... 17

*SEC v. Monterosso,*
    No. 07-61693-CIV, 2012 WL 12950028 (S.D. Fla. Feb 16, 2012) ................................. 17

*SEC v. Sethi Petroleum, LLC,*
    2015 WL 4040123 (E.D. Tex. July 1, 2015) .................................................. 18

*SEC v. Texas Gulf Sulphur,*
    401 F.2d 833 (2d Cir. 1968), *cert. denied sub nom,* 394 U.S. 976 (1969), *reh'd denied*
    404 U.S. 1064 (1972) ........................................................................ 11

*Simpson v. AOL Time Warner Inc.,*
    452 F.3d 1040 (9th Cir. 2006), *vacated by Simpson v. Homestore.com, Inc.,* 519 F.3d
    1041 (9th Cir. 2008) ........................................................................ 12

*TSC Industries, Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) .......................................................................... 11

*United States v. Iakovou, et al.*
    Case No. 22-cr-00028-CDL-MSH ............................................................... 1, 18

## Statutes

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ................................ 11
Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)................................. 11
Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2) ...................................... 17

## Other Authorities

10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2688 (2d ed. 1983) ...... 3

## Rules

Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5 ............................. 11

Plaintiff Securities and Exchange Commission (the "Commission"), pursuant to Federal Rule of Civil Procedure 55(b)(2), respectfully moves for entry of default judgments of permanent injunction and other relief against Defendants George Iakovou ("Iakovou") and Vika Ventures LLC ("Vika") (collectively the "Defendants") and states as follows:

### INTRODUCTION

The Commission filed this action alleging that from later 2019 through the end of 2021, Iakovou, the co-founder and CEO of Vika, used Vika to defraud investors of more than $6.09 million through fraudulent offers and sales of purported shares of private companies that might hold an initial public offering ("IPO").  Iakovou enticed investors to Vika by offering for sale "hard to acquire securities" in desirable pre-IPO companies at lower prices than other venture capital firms.  However, at both the time of the solicitation and the execution of contracts for sale, Vika did not own the shares and, subsequently never acquired them.  In fact, instead of purchasing securities, Iakovou, through Vika, misappropriated investor funds to support his lavish lifestyle.

As discussed below, the Commission has met the procedural requirements for entry of a default judgment against Iakovou and Vika, and the Complaint establishes their liability for violating the federal securities laws and the Commission's entitlement to its requested relief.  In particular, the Commission is seeking only non-monetary relief at this time.  As to the monetary relief and as discussed below, the ultimate resolution of the parallel criminal case will inevitably impact the amount the Commission intends to seek in this case.  *See United States v. Iakovou, et al.*, Case No. 22-cr-00028-CDL-MSH.  Accordingly, the Commission is also requesting that this Honorable Court defer ruling on the disgorgement, prejudgment interest, and civil penalty amounts until the parallel criminal case is resolved.  In particular, The Commission respectfully requests the Court allow the Commission to file the appropriate motion or dismissal papers regarding those

monetary claims 45 days after the resolution of the parallel criminal case.  This will conserve judicial resources and serve the interests of justice in both this case and the parallel criminal case.

## PROCEDURAL HISTORY

On December 7, 2022, the Commission filed its Complaint.[1]  (D.E. 1.)  On January 21, 2023, the Commission served the Summons and Complaint in this matter on Iakovou and Vika. (D.E. 7, 8).  On March 17, 2023, the Commission filed its application to the Clerk for Entry of Default.  (D.E. 12).  On the same day, the Clerk entered Defaults as to Iakovou and Vika.  The Court instructed the Commission to file its Motion for Default Judgment within 21 days.

## ARGUMENT

### I.   Legal Standards

The factual allegations of a complaint are deemed admitted by the entry of a default. *Buchanan v. Bowman*, 820 F.2d 359, 360 (11th Cir. 1987); *Nishimatsu Construction Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).  When a defendant fails to defend an action and a default has been entered, his liability for violations of the federal securities laws as alleged in the complaint, and the propriety of the relief sought, is deemed established.  *Buchanan*, 820 F.2d at 360;  *Lay v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1106 (11th Cir. 2015; *Dundee Cement Co. v. Howard Pipe & Concrete Products, Inc.,* 722 F.2d 1319, 1323 (7th Cir. 1983); *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).  Here, Iakovou and Vika are in default, and accordingly, the factual allegations of the Complaint, except

---

[1] On December 11, 2022, the Commission filed its motion to approve consent motion with Zbravos, which reflects the settlement she reached with the Commission.  (D.E. 5.)  On December 13, 2022, the Court entered the Consent Judgment as to Zbravos.  (D.E. 6.)  The Consent Judgment resolved all issues of liability and non-monetary relief as to Zbravos.  The Consent Judgment provides that the Commission will file a motion to determine any monetary relief against Zbravos. As discussed below, the Commission requests that this Court defer ruling on the specific amounts of monetary relief as to <u>all</u> Defendants pending the resolution of the parallel criminal case.

2

those relating to damages, are accepted as true.  *Id.*; *see also* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2688, p. 412 (2d ed. 1983); *Thomson v. Wooster*, 114 U.S. 104 (1885).  A district court need not hold a hearing to grant a default judgment.  *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) ("Given its permissive language, Rule 55(b) does not require a…hearing in every case…The district court may forego a hearing where all essential evidence is already of record.") (internal quotation and citations omitted).  The Complaint's allegations establish Iakovou and Vika's liability and the propriety of the relief the Commission seeks in this motion.

## II.    The Factual Allegations of the Complaint Are Deemed Admitted Against Iakovou and Vika

### A.    The Creation of Vika Ventures

Since 2015, Iakovou has worked in the financial services sector and has unsuccessfully attempted to pass the entry-level registered representatives' exam on no less than three occasions. (Compl. ¶ 18, D.E. 1.)  Since 2018, Iakovou was employed at an exempt reporting private fund advisor that primarily conducted deals in the pre-IPO space.  (*Id.*)  During the summer of 2019, Iakovou asked his then-girlfriend, Zbravos, to work as his assistant there.  (*Id.*)  In November 2019, after a series of disagreements with the owner of the private fund advisor – including about Iakovou's failure to pay back monies owed to him – Iakovou left the advisor to strike out on his own.  (*Id.*)  Zbravos left with Iakovou and also began a romantic relationship with him.  (*Id.* at ¶¶ 3, 18)

In fall of 2019, Iakovou and Zbravos founded Vika as a start-up venture capital fund offering for sale pre-IPO securities of well-known private companies.  (Compl. at ¶ 19.)  He held himself out as the CEO, served as the face of the company, and communicated with potential and

3

actual investors.  (*Id*.)  Zbravos was Vika's Finance Manager and performed various duties, primarily back office support.  (*Id*.)

To attract investors, Iakovou created a series of documents that conveyed materially false and misleading information about Vika but appeared genuine to investors.  (Compl. at ¶ 21.) Specifically, Iakovou enrolled Vika in an online investing profiling platform that allowed him to self-report information and create a Venture Capital Profile ("Vika Profile") to share with potential investors.  (*Id*.)  He falsified information about Vika's net worth, previous investments, assets under management, and number of employees.  (*Id*.)  By December 2020, Iakovou falsely reported that Vika had more than $80 million assets under management with ten investments supported by nine employees.  (*Id*.)  None of this was accurate.  (*Id*.)  Among other things, Iakovou sent to investors:  (1) the Vika Profile; and (2) reports from this online platform for various private companies Vika was offering of pre-IPO securities.  (*Id*.)  Investors believed this information accurately reflected Vika as a growing and dynamic business, but Iakovou knew the documents were entirely fabricated.  (*Id*.)

Iakovou also provided potential investors with PPMs for Vika that he created and that contained materially false or misleading information.  (Compl. at ¶ 22.)  For example, he provided a PPM to potential investors that represented that Vika would acquire shares or interests in pre-IPO companies on behalf of investors.  (*Id*.)  The PPMs portrayed Vika as a legitimate business, but, contrary to that representation, no securities were ever purchased by Vika.  (*Id*.)   Vika's website touted purported previous investments made by Vika in companies that had successful IPOs as well as opportunities to invest in much sought after private companies anticipating IPOs. (*Id*. at ¶ 23.)  Through its website, Vika held itself out as a venture capital firm with prior successes.

(*Id.*)  In actuality, this information was materially false and misleading as Vika had not participated in any previous investments nor did it own any shares in pre-IPO companies.  (*Id.*)

Prior to investing with Vika, several investors visited Vika's website and were presented with the false and misleading information.  (Compl. at ¶ 24.)  They also viewed hyperlinks to several news articles that quote Iakovou in various financial news publications talking about similar investment opportunities, all of which created the aura of a highly successful company, leading individuals to invest.  (*Id.*)

### B.   Vika's Fraudulent Offer and Sale of Pre-IPO Securities

On January 2, 2020, Vika received its first investment when the mother of Iakovou's childhood friend invested $105,000 for what she believed was an investment in the pre-IPO shares of Company A.  (Compl. at ¶ 25.)  Ultimately, Iakovou and Zbravos transferred or received over half of these funds to their personal bank accounts.  (*Id.*)  From the remaining monies, Zbravos made payments to the Vika business credit card for personal expenses incurred by Iakovou.  (*Id.*)  No shares were ever purchased in Company A for the benefit of Vika's first investor.  (*Id.*)

#### 1.   Georgia Investing Group

Vika did not receive another investment for nearly six months until Iakovou connected with a former client from his previous employer.  (Compl. at ¶ 26.)  In June 2020, Iakovou pitched Vika to this individual, who lives in Georgia and is a member of an informal, social investing club that shares interesting investment opportunities with its participants.  (*Id.*)  This individual and a few other club participants happened to be pricing the pre-IPO securities of Company B around the time Iakovou reached out.  (*Id.*)  When asked about Company B, Iakovou told this individual that Vika could offer it at $200 a share.  (*Id.*)  Because the other two identified offers came in at $250 and $275 per share and one investor had a prior positive experience with Iakovou, these three

individuals each decided to invest with Vika after reviewing the supporting paperwork provided by Iakovou.  (*Id*.)

When one investor from Georgia asked about the fee structure for the initial Company B offer, Iakovou confirmed the investor's understanding that he could pay an extra $1,000 "commission" rather than have Iakovou take the fee out of his investment.  (Compl. at ¶ 27.) Iakovou told the investor: "[t]hat way the full $20,000 would be towards stock."  (*Id*.)  However, Iakovou and Vika never purchased any shares of Company B on his behalf. (*Id*.)  Several of the Georgia investors shared information about their Vika investments with numerous friends and family, who in turn, shared with other friends and family.  (*Id*. at ¶ 28.)  By offering all of these individuals incredibly enticing deals in additional companies, Vika received investments from 34 people in approximately eight private companies.  (*Id*.)

For example, on March 2, 2021, Iakovou emailed various investors with an alleged opportunity in Company C.  (Compl. at ¶ 29.)  Iakovou said via email:  "Just sending out [the Company C] docs again.  (*Id*.)  We have a hard deadline of Wednesday for money in to close the transaction before IPO.  Price is set at $6.50.  Your fee structure will be 0% upfront and 10% on the back."  (*Id*.)  Following Iakovou's solicitation, at least six individuals with prior Vika investments made what they thought were investments in Company C.  (*Id*.)  From June 2020 until early April 2021, Iakovou and Vika defrauded these 34 individuals of approximately $2.9 million by leading them to believe they were investing in pre-IPO companies when, in fact, no shares were purchased.  (*Id*. at ¶ 30.)

## 2.   Other Vika Investors

On June 23, 2020, a Zbravos family member wired $50,000 to Vika for what she believed was an investment in Company A.  (Compl. at ¶ 31.)  On July 3, 2020, Iakovou sent the family

member and Zbravos the buy confirmation letter for the purchase.  (*Id*.)  The letter sent via email
stated:

> Your total capital contribution of $50,000.00 received on June 23rd, 2020,
> constitutes a 100% membership interest in Series A-9 of the company.  Series A-9
> currently holds 9,090 shares of common stock for [Company A] through an affiliate
> of the Company.  There have been 0% fees deducted on this transaction and your
> capital contribution is $50,000.00 which has been applied to an investment in 9,090
> underlying shares of Company A at a purchase price equivalent to $5.50 per share.

(*Id*.)  Vika did not hold 9,090 shares of common stock for the family member.  (*Id*.)

Upon receipt of the proceeds, Iakovou directed Zbravos to wire $5,000 to each of their
personal accounts.  (Compl. at ¶ 31.)  Ultimately, Iakovou used the remaining $40,000 for his
lavish personal spending.  (*Id*.)  No shares were purchased on the family member's behalf.  (*Id*.)

In January 2021, a group of investors from California and Indiana, who pool resources to
make investments in pre-IPO securities, discovered the Vika website and other internet
information regarding Vika while researching potential opportunities to invest in Company B; they
contacted Iakovou.  (Compl. at ¶ 32.)  Iakovou told them Vika was authorized by Company B to
transact secondary stock sales from employees and investors.  (*Id*.)  Iakovou also provided them
with the Vika Profile, a company profile from the online investing platform for Company B, Vika's
PPM, and a redacted stock transfer agreement that purported to show Vika holding Company B
securities.  (*Id*.)  Given these assurances, on January 27, 2021, these investors wired $2.06 million
to Vika for what they believed was for 8,000 shares of Company B at $250 a share with an upfront
fee of 3%.  (*Id*.)  Iakovou directed Zbravos to wire him $690,000 and transfer $690,000 to herself
on January 28, 2021.  (*Id*.)

On February 8, 2021, the group made an additional investment for 1,600 shares of
Company B and wired $412,000 to Vika.  (Compl. at ¶ 33.)  On February 9, 2021, at Iakovou's
direction, Zbravos transferred $150,000 of this money to her personal bank account and wired

$150,000 to Iakovou's personal account.  (*Id*.)  No Company B shares were ever purchased by Vika or Iakovou.  (*Id*.)

After these initial investments, these investors expressed interest in another deal with Vika but wanted additional assurances from Iakovou before proceeding.  (Compl. at ¶ 34.)  Iakovou made two trips to California to meet with them.  (*Id*.)  During those trips, he made various promises, including that he would file a Form ADV with the Commission, create an online portal to track their investments, provide proof of actual ownership of the securities, and provide a notarized and unredacted stock transfer agreement.  (*Id*.)  Although Iakovou had dinner with the investors one night, he then postponed meeting with them thereafter.  (*Id*.)  Iakovou claimed he was sick.  (*Id*.)  The investors only learned by calling his hotel that Iakovou had already traveled back to New York.  (*Id*.)  Iakovou never provided the requested information, and the group did not invest again thereafter.  (*Id*.)

In June 2021, after Iakovou ceased communicating with them, these four investors made contact with both Company B and another company for which Vika had solicited an investment. (Compl. at ¶ 35.)  Both companies told these investors they had no relationship with Vika nor was Vika authorized to transact on their behalf.  (*Id.*)

### 3.     Iakovou's Additional Lies

In March 2020, a credit card company closed the Vika charge account after Iakovou made several unsuccessful payments after charging tens of thousands of dollars in personal expenses. (Compl. at ¶ 36.)  Zbravos used her own funds to pay the balance and sought reimbursement from Iakovou.  (*Id*.)  Iakovou paid Zbravos back with proceeds received from investors.  (*Id*.)  In fact, Iakovou repaid a portion of the balance by instructing Zbravos to take the proceeds of an entire

investment sent by one individual.  (*Id*.)  When asked how Vika would give this person his Company A shares, Iakovou told Zbravos he had "extra" shares, which was patently false.  (*Id*.)

To further hide his misconduct, Iakovou took steps to direct the use of fictitious wire transfers.  (Compl. at ¶ 37.)  In November 2020, five months after Vika began raising money in earnest, Iakovou attempted to make a wire transfer to an entity he told Zbravos was the investment bank from which Vika was purchasing the pre-IPO securities.  (*Id*.)  Since he was not able to make the transfer, Iakovou instructed Zbravos to send money via an ACH payment system for the purchase of pre-IPO securities.  (*Id*.)

Despite the volume of investor proceeds coming into Vika for investments, this is the first time Iakovou instructed Zbravos to wire funds for the purchase of securities.  (Compl. at ¶ 38.)  While at Vika, Zbravos wired more than $1 million to this account without ever receiving a single confirmation of monies received or stock purchased.  (*Id*.)  Unbeknownst to Zbravos, the purported investment bank account number Iakovou provided to her belonged to one of his friends who ultimately transferred almost all of the funds back to Iakovou.  (*Id*.)  In January 2021, Zbravos texted Iakovou to say that their friends thought Vika, Iakovou, and Zbravos were "scammers & unprofessional" stating, "You've been lying to me...If you didn't have the f*!@(* stock why did you do this?"  (*Id*. at ¶ 38.)  Iakovou did not reply.  (*Id*.)

Within Vika, the fraudulent nature of the operation was apparent.  For example, on April 3, 2021, Zbravos discovered that Iakovou had faked the emails supposedly sent to her from the investment bank.  (Compl. at ¶ 46.)  Zbravos texted Iakovou, stating, "I think if you want to save yourself. Stop taking accepting further investments & find whatever stock you don't own & end it." (*Id*.)  Iakovou responded that he had all the stock that was needed, to which Zbravos replied: "No you don't, can you stop lying to me for just a second & talk openly. Forget about [stock

transfer agreements] you don't even have confirmation emails stating the purchase of stock." (*Id.* at ¶ 47.)

### 4. <u>The Unraveling of Vika</u>

Some investors believed they owned shares of Company A, which conducted its IPO in September 2020. (Compl. at ¶ 40.) Iakovou told the investors who believed they owned pre-IPO securities in Company A – including Zbravos' family member – that there was a six month lock up period, which would expire at the end of March 2021. (*Id.*) At March's end, investors began questioning Iakovou as to when they would receive their shares. (*Id.*)

Iakovou provided a myriad of false or misleading excuses as to why Vika could not transfer the shares. (Compl. at ¶ 41.) First, Iakovou said there was a long list of investing firms that the transfer agent was working through and Vika's shares were not priorities. (*Id.*) Then, he said the transfer agent experienced significant issues and would not be able to send the shares promptly. (*Id.*) He also sent multiple emails blaming various delays, however, the truth was that Vika never purchased the securities. (*Id.*) Thereafter, he ceased communicating with any investors. (*Id.*)

Zbravos formally left the company on June 4, 2021. (Compl. at ¶ 42.) After her departure, Iakovou continued to raise approximately $395,000 funds from additional investors through at least December 2021. (*Id.* at ¶ 43.) Iakovou directed these investors to write checks or wire funds to his personal account earmarked for a Vika investment, as the existing Vika bank accounts had been closed. (*Id.*)

### 5. <u>Iakovou Misappropriated Investor Funds for His Personal Use</u>

Iakovou spent his share of the proceeds lavishly. (Compl. at ¶ 50.) He spent more than $680,000 on luxury watches and designer jewelry. (*Id.*) Over $173,000 was spent in nightclubs and lounges in Miami, New York, France, and Greece. (*Id.*) Iakovou purchased more than

$372,000 worth of designer goods and spent nearly $220,000 renting or buying luxury cars.  (*Id*.)  Iakovou dined at high-end restaurants with some meals costing more than $112,000.  (*Id*.)  He spent $56,000 on entertainment and sports betting while also racking up $70,000 on home furnishings.  (*Id*.)  Iakovou spent nearly $650,000 on private jet travel and another $125,000 on additional travel expenses including stays at five-star hotels in Miami, Florida, Cannes, France, and Athens, Greece.  (*Id*.)  Iakovou also invested more than $135,000 on a cryptocurrency exchange for his own investment.  (*Id*.)

### III.   Defendants Violated the Anti-Fraud Provisions of the Federal Securities Laws

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] prohibits fraudulent conduct in connection with the purchase and sale of securities.  Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] prohibits fraud in the offer or sale of a security.  These provisions make it unlawful to employ, or cause to be employed, devices, schemes or artifices to defraud, or to make any untrue statement of material fact or omit to state material facts in connection with the sale of securities. The Commission must establish that the Defendants acted with scienter to prove violations of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5.  *Aaron v. SEC*, 446 U.S. 680 (1980).  To prove violations based on misrepresentations or omissions, the Commission must show that the misrepresentations or omissions were material. *SEC v. Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968), *cert. denied sub nom*, 394 U.S. 976 (1969), *reh'd denied* 404 U.S. 1064 (1972).  A misrepresentation or omission is material if there is a substantial likelihood that under all circumstances it would have assumed actual significance in the deliberations of a reasonable investor. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976).

In addition to liability for fraudulent misrepresentations and omissions, the Securities Act and Exchange Act – specifically, Sections 17(a)(1) and (3) and Exchange Act Rules 10b-5(a) and (c) – impose what is referred to as "scheme liability."  Scheme liability exists when a "defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud."  *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050 (9th Cir. 2006), *vacated by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008); *see also Aaron*, 446 U.S. at 696 n.13 (defining "scheme" as "'[a] plan or program of something to be done; an enterprise; a project; as, a business scheme [, or] [a] crafty, unethical project").

Here, through their conduct, Iakovou and Vika violated Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 and Section 17(a) of the Securities Act.  (Compl. at ¶¶ 52-57.) Unless the Court permanently enjoins them, they are reasonably likely to continue to violate these provisions.  (*Id*. at ¶¶ 54, 57.)

## A.     Iakovou and Vika Made Material Misrepresentations

Iakovou and Vika made numerous material misrepresentations to investors concerning their ability to trade securities, obtain significant returns and protect their escrowed deposits, including that Vika had the ability and intention to acquire shares or interests in pre-IPO companies.  For example, Iakovou created PPMs for Vika portraying it as a legitimate business. (Compl. at ¶ 22.) (*Id*.)  In reality, Vika never purchased <u>any</u> securities for its clients. (*Id*.)  Further, through its website, Vika held itself out as a venture capital firm with prior successes.  (*Id*. at ¶ 23.)  In particular, Vika's website touted its purported previous investments in companies that had successful IPOs, and it touted opportunities to invest in much sought after private companies

anticipating IPOs.  (*Id*.)  All of this information was false.  (*Id*.)  In actuality, Vika had not participated in any previous investments nor did it own any shares in pre-IPO companies.  (*Id*.)

Iakovou and Vika specifically received funds from investors with the expectation of those funds being invested in pre-IPO shares of companies.  For example, on January 2, 2020, the mother of Iakovou's childhood friend invested $105,000 believing the funds would be used for pre-IPO shares of Company A, which were never purchased.  (Compl. at ¶ 25.)  Further, from June 2020 until early April 2021, Iakovou and Vika defrauded 34 investors from Georgia of approximately $2.9 million.  (*Id*. at ¶ 30.)  They had told these investors they were investing in pre-IPO shares, when, in fact, no shares were actually purchased.  (*Id*.)

Similarly, Iakovou and Vika defrauded a group of California based investors.  Like other investors, Iakovou provided them with the Vika Profile, a company profile from the online investing platform for Company B, Vika's PPM, and a redacted stock transfer agreement that purported to show Vika's holding of Company B securities.  (Compl. at ¶ 32.)  Given these assurances, these investors:  (1) wired $2.06 million to Vika, on January 27, 2021, for what they believed was for 8,000 shares of Company B at $250 a share with an upfront fee of 3%; (2) wired $412,000 to Vika for an additional 1,600 shares of Company B.  (*Id* at ¶¶ 32, 33.)  Contrary to Iakovou and Vika's representations, no Company B were ever purchased.  (*Id*. at ¶ 33.)  Ultimately, their lies defrauded millions of dollars from investors.

Iakovou and Vika's misrepresentations were material.  Courts generally consider a statement or omission to be material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action."  *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1327 (11th Cir. 1982).  A reasonable investor would have attached importance to Iakovou and Vika's misrepresentations in determining his or her course of action.  As the very legitimacy of the trades

were at the heart of the misrepresentations, a reasonable investor would have attached importance to those facts.

### B.   Iakovou and Vika Orchestrated a Fraudulent Scheme

Iakovou and Vika's actions also constituted a scheme.  Their actions, as described above, served to create a business scheme projecting the appearance of a valid, working trading system when, in fact, no pre-IPO shares were actually purchased by Iakovou or Vika.  *See Aaron*, 446 U.S. at 696 n.13.  Beyond his mere misrepresentations, Iakovou also visit investors, dined with them, and provided numerous false assurances that both he and Vika were legitimate.  (Compl. at ¶ 34.)  None of that was true.  Moreover, when investors frantically demanded their shares transferred to them, Iakovou blamed a myriad of reasons why he could not transfer the shares.  (*Id*. at ¶ 42.)  None of these excuses were true, as the real reason was that neither Iakovou nor Vika had purchased the securities.  (*Id*.)  All of these actions, including the others described above, were part of Iakovou and Vika's scheme.  A reasonable investor would have attached importance to their scheme to falsely claim investor funds were being used to purchase pre-IPO shares when, in fact, they were used for Iakovou's own personal expenses.  *Carriba Air, Inc.*, 681 F.2d at 1327.

### C.   Iakovou and Vika Acted with Scienter

Iakovou and Vika acted with scienter.  Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing that the defendants acted with scienter.  Scienter is a mental state embracing intent to deceive, manipulate or defraud.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness.  *Carriba Air, Inc.*, 681 F.2d at 1324.  A finding of scienter is not required to establish a violation of Sections 17(a)(2) or (3) of the Securities Act – only negligence is required.  *See Aaron*, 446 U.S. at 696-97.

Iakovou and Vika's actions show they acted with a high degree of scienter. Iakovou created PPMs, welcome letters, and company profiles that depicted Vika as having a rich business of $80 million in assets under its management and supported by nine employees. (Compl. at ¶ 4.) All of this was false. (*Id*.) In fact, despite their numerous representations to its investors, Iakovou and Vika never closed a single deal to purchase securities. (*Id*. ¶ 6.) Instead, Iakovou fabricated all the information in an effort to induce investors to send him their funds. (*Id*.) When investor funds arrived into Vika, the Defendants would essentially split the funds three ways for their own usage, with the vast majority of funds retained by Vika routed back to Iakovou. (*Id*. ¶ 7.) Iakovou also took further steps to hide his actions by directing the use of fictitious wire transfers. (*Id*. ¶ 37.) Even Zbravos confronted Iakovou regarding the scope of the fraud, questioning how much stock he actually had, and the extent of his lies. (*Id*. at ¶¶ 46-47.) Lastly, rather than actually investing his clients funds as promised, Iakovou spent hundreds of thousands of dollars on jewelry, nightclub visits, luxury cars, sports betting, luxury travel, high-end dinners, and other extravagancies. (*Id*. at ¶ 50.) Iakovou and Vika's acts reeked of scienter.

### D.   Iakovou and Vika's Actions Utilized Interstate Commerce and Were in Connection with the Purchase of Stocks

Iakovou and Vika's misrepresentations and fraudulent scheme were all in connection with the purported purchase of stocks. Throughout the fraud, Iakovou and Vika's acts revolved around inducing investors to provide them with funds in order to purportedly acquire securities in pre-IPO companies at lower prices that other venture capital firms, even though they never owned or acquired such securities. (Compl. at ¶ 19.) Morover, Iakovou and Vika used interstate commerce to orchestrate their scheme. (*Id*. at ¶ 17.) As part of the fraud, Iakovou would email investors to induce their investments and send them PPMs. (*Id*. at ¶¶ 29, 31, 32.) He would also communicate with investors via email, telephone, and text. (*Id*. at ¶ 3.) Vika would receive investor funds via

wire.  (*Id*. at ¶¶ 31-33.)  Also, Vika had both a website, falsely touting prior investment successes, and an online investment profiling platform that allowed Iakovou to share the Vika Profile with potential investors.  (*Id*. at ¶¶ 20, 23.)

For all the foregoing reasons, the Commission has established a *prima facie* case that Iakovou and Vika violated:  (1) Exchange Act Section 10(b); and (2) Exchange Act Rule 10b-5 and Section 17(a) of the Securities Act.

IV.    **The Court Should Grant the Requested Relief Sought By the Commission**

A.    **Permanent Injunctive Relief as to Iakovou and Vika**

Sections 20 and 22 of the Securities Act and Sections 21(d) and 21(e) of the Exchange Act authorize the Commission to seek injunctive relief where it appears that a person is engaged or about to engage in violations of the federal securities laws.

Here, the Commission seeks a permanent injunction enjoining Iakovou and Vika from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

In considering requests for permanent injunctions, courts determine whether there is a reasonable likelihood that the defendant will engage in future violations of the federal securities laws by examining several factors, including the egregiousness of the violation, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, and the defendant's recognition of the wrongful nature of his conduct.  *See SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).

Injunctive relief is appropriate in this case because Iakovou and Vika's fraudulent conduct was egregious, occurred repeatedly with different victims, included an extreme level of scienter, and they have not acknowledged the wrongful nature of their conduct.  Moreover, there is a high

likelihood that, unless enjoined, Iakovou and Vika will continue to engage in similar misconduct in the future.  Iakovou and Vika have not provided, and cannot provide, any assurances to the contrary.  The Court should enter permanent injunctions against them.

**B.     Officer and Director Bar as to Iakovou**

A district court has the authority to impose an officer and director bar under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] (and in the exercise of its substantial equitable powers). *SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013).  In doing so, courts generally consider a number of factors including: (1) the "egregiousness" of the underlying securities law violations; (2) the defendant's "repeat offender status"; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.  *See SEC v. Monterosso*, No. 07-61693-CIV, 2012 WL 12950028, at *4 (S.D. Fla. Feb 16, 2012) (citing *SEC v. Levine*, 517 F. Supp. 2d 121, 145-147 (D.D.C. 2007)); *see also SEC v. Patel*, 61 F.3d 137, 151 (2d Cir. 1995).  None of these factors is controlling and the court retains substantial discretion in determining whether to impose a bar.  *SEC v. Miller*, 744 F. Supp. 2d 1325, 1347 (N.D. Ga. 2010).

Here, the Court should impose a permanent officer and director bar against Iakovou.  As discussed above, his fraudulent conduct and misrepresentations were egregious and recurrent, and involved a high degree of scienter.  His position as Vika's CEO further argues in favor of the bar.  Moreover, the majority of the money he defrauded from investors went directly to fund his lavish lifestyle.  The Court should impose a permanent officer and director bar against Iakovou.

**C.     Conduct Based Injunction as to Iakovou**

The Commission also seeks an order prohibiting Iakovou from participating in securities transactions except for his own account.  Given Iakovou's egregious conduct, there is no reason

he should be involved in securities transactions on behalf of others.  *See*, *e.g.*, *SEC v. Aequitas Mgmt., LLC*, 2016 U.S. Dist. LEXIS 34187, *6 (D. Or. Mar. 15, 2016) (entering preliminary injunction preventing defendants from participating in the issuance, offer, or sale of any security of any entity controlled by defendants); *SEC v. Eadgear, Inc.*, 2015 WL 11578507, *3 (N.D. Cal. July 14, 2015) (entering preliminary injunction prohibiting defendants from selling specific securities by specific means); *SEC v. Sethi Petroleum, LLC*, 2015 WL 4040123, *1 (E.D. Tex. July 1, 2015) (noting preliminary injunction that restrained and enjoined defendant from participating in securities transactions but specifically allowing defendant to purchase and sell securities listed on a national securities exchange for his own personal accounts); *SEC v. Mattera*, 2013 WL 6485949, *18 (S.D.N.Y. Dec. 9, 2013) (same).

### D.   The Court Should Defer Ruling on Disgorgement, Prejudgment Interest, and Civil Penalties Amounts Until the Resolution of the Parallel Criminal Case

The parallel criminal case against Iakovou and Zbravos is currently scheduled for trial during the September 2023 trial term.  *See United States v. Iakovou, etc.*, Case No. 22-cr-00028-CDL-MSH (D.E. 49).  The outcome of the criminal trial will necessarily affect the respective disgorgement, prejudgment interest, and civil penalty amounts the Commission will seek against all of the Defendants.  For example, the Commission would not seek to "double collect" fees sought or awarded as restitution.  Additionally, if one or more of the Defendants is incarcerated the Commission will likely dismiss some, if not all, of the civil penalty claims based on such a sentence.  The outcome of the criminal trial will similarly affect the determination of any monetary penalties as to Zbravos.

Once the criminal case is concluded, the undersigned counsel must seek authority from the five-member Commission to recommend amounts for disgorgement, prejudgment interest, and civil penalty.  Alternatively, the undersigned may seek authority to dismiss those claims based on

the outcome of the parallel criminal case.  Accordingly, the Commission respectfully requests the Court give undersigned counsel an additional 45 days after the resolution of the parallel criminal case to obtain authority for a specific monetary relief amounts against each of the Defendants, including Zbravos.

Lastly, and as stated in the motion, a hearing is neither required nor appropriate in this case to determine the suitably of the default judgments or the future monetary penalty amounts.  The Commission submits that the Court can rule based on these papers and does not believe a hearing is necessary.

## **<u>CONCLUSION</u>**

For the aforementioned reasons, the Commission's Motion for Default Judgment should be granted, and the Court should defer ruling on monetary relief amounts until the conclusion of the parallel criminal case, with the Commission ordered to file its motion to determine those amounts 45 days after the resolution of the parallel criminal case.  Proposed Final Judgments as to Vika and Iakovou are attached hereto as Exhibits, for the Court's convenience and consideration.

Dated: April 7, 2023                    Respectfully submitted,

/s/ James M. Carlson
James M. Carlson
Supervisory Trial Counsel
S.D. Fla. Court No. A5501534
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-3711
CarlsonJa@sec.gov

*Counsel for Plaintiff Securities and Exchange Commission*

19

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 7, 2023, I electronically filed the foregoing document with the

Clerk of Court for the U.S. District Court, Middle District of Georgia, Columbus Division, using

the Court's CM/ECF system of the Court.  I hereby certify that I have served all counsel of

record.

/s/ James M. Carlson
James M. Carlson